# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:  Case No. A02-01042-DMD

ALLVEST CORPORATION, d/b/a
Allvest, Inc.,

      Debtor.

Chapter 7

> **Filed On
> 2/2/06**

KENNETH BATTLEY, TRUSTEE,

      Plaintiff,

      v.

WILLIAM C. WEIMAR,

      Defendant.

Adversary No. A04-90106-DMD

# PRELIMINARY
# REPORT AND RECOMMENDATION
# TO THE UNITED STATES DISTRICT COURT[1]

After trial of this matter on December 12 through 15, 2005, the bankruptcy court, in accordance with 28 U.S.C. § 157(c)(1), hereby submits its proposed findings of fact and conclusions of law to the United States District Court for entry of a final order and judgment.  The bankruptcy court recommends entry of an order and judgment in favor of the plaintiff and against the defendant for $300,000 plus pre-judgment interest from January 13,

---

[1]This is a preliminary report and recommendation because the amount of the plaintiff's attorney's fees is unliquidated.  After the fees are liquidated, the bankruptcy court will prepare a final report and recommendation, which will be submitted to the district court.

2005, until entry of final judgment, attorney's fees in the sum of $_____,

and its costs of suit.


I.    Proposed Findings of Fact

1.    Plaintiff Kenneth Battley is the duly appointed trustee in the chapter 7

bankruptcy case *In re Allvest Corporation, d/b/a Allvest, Inc.*, Main Case No. A02-01042-

DMD.

2.    The debtor, Allvest Corporation ("Allvest"), is an Alaska corporation.  It

administered work release programs and provided other services for the Alaska Department

of Corrections and the federal government.  It employed 800 to 1,000 people.

3.    Defendant William C. Weimar is, and at all relevant times was, the sole

shareholder, director and president of Allvest.

4.    Wassillie William Alexie was injured in 1995 by employees of Allvest and

later died.  Evelyn Brown is the personal representative of the estate of Mr. Alexie.

5.    In 1996, inmates of a halfway house administered by Allvest were raped and

sexually abused by an employee of Allvest.  Five of these inmates are creditors in the Allvest

bankruptcy case and are hereinafter collectively referred to as "the J.W. creditors."

6.    In June, 1997, the J.W. creditors filed a lawsuit against Allvest in state superior

court seeking damages for their injuries.

7.    In July, 1997, Brown also filed a lawsuit in state superior court against Allvest

seeking damages for Alexie's injuries and death.

2

8.     Brown obtained a judgment against Allvest for more than $1,000,000 in compensatory damages and $2,000,000 in punitive damages in July of 2001.

9.     The J.W. creditors received a judgment for $58,000 in compensatory damages and $1,000,000 of punitive damages in April 2002.

10.     No portion of these judgments has been paid by Allvest's liability insurer. Allvest's insurer, Classic Fire and Marine, is in an insurance liquidation proceeding in state court in Indiana.

11.     In 1998, after the Brown and J.W. creditor lawsuits had been initiated but before judgments had been entered, Weimar sold the assets of Allvest for $20 million and began a series of asset transfers to separate corporations and trusts. Allvest made a $13.475 million distribution to Weimar in 1998.

12.     After the J.W. creditors and Brown obtained state court judgments against Allvest, they each filed supplemental complaints in aid of execution against Weimar and other non-debtor entities to recover the Allvest assets on alter ego, fraudulent transfer and other grounds.

13.     In May of 2002, the J.W. creditors obtained a temporary restraining order freezing Weimar's assets. Later, they obtained a preliminary injunction continuing the freeze.

14.     In May of 2002, the J.W. creditors seized $490,854 from successful levies against Allvest.

3

15. Brown filed an involuntary chapter 11 petition against Allvest on October 3, 2002. Allvest filed a non-opposition to the petition and an order for bankruptcy relief was entered on November 5, 2002. The bankruptcy case was thereafter converted to one under chapter 7 on motion of Allvest.

16. On November 1, 2002, Brown's and the J.W. creditor's state court lawsuits [*Evelyn Brown v. Allvest Corporation*, 3AN-97-5512 CI, and *J.W., B.P., K.S., C.W., and A.W. v. Allvest, Inc.*, 3AN-97-7192 CI, both pending in the Superior Court for the Third Judicial District at Anchorage] were removed to the bankruptcy court by Weimar in accordance with 28 U.S.C. § 1452(a).

17. In November, 2002, Weimar was considering entering into a settlement agreement with Battley, Brown and the J.W. creditors. Integral to the settlement would be the transfer of a vessel belonging to Weimar, the *Renewal*. Weimar stood to gain significant tax benefits by transferring the *Renewal* and other assets to settle the claims. The tax benefits would have been lost if the settlement was not reached by December 31, 2002. The desire to capture the tax benefits drove the settlement discussions.

18. A settlement meeting was held on December 20, 2002. The meeting was held at the office of Weimar's counsel, Spencer Sneed. Weimar attended the meeting telephonically from Montana. Weimar's CPA, John Letourneau, and his attorney Sneed were present. The trustee and his counsel, John Siemers, personally attended the meeting, as did the attorneys for the J.W. creditors (Brett von Gemmingen) and Brown (Don Bauermeister).

19.     The parties discussed various proposals, all of which contemplated payments or asset transfers from Weimar to Battley.  During the course of the negotiations, Weimar and his representatives prepared a document which summarized assets owned or controlled by Weimar.  This document, entitled "Summary Assets," (Exhibit 43) was thereafter provided to the other parties in attendance at the meeting.

20.     The parties were unable to negotiate a settlement at this first meeting, which ended with the parties at an impasse.

21.     Settlement discussions resumed on December 24, 2002, after Battley contacted Sneed.  The parties further negotiated from December 26 through December 28, 2002.

22.     Battley's settlement goal was to obtain approximately 50% of the net value of Weimar's assets.

23.     Weimar's yacht, the *Renewal*, was consistently offered to Battley as part of the settlement agreement.

24.     In the course of the settlement discussions, Weimar informed Battley and the other parties that he had paid $600,000 for the *Renewal* in 1996.  He had actually paid only $335,000 for it.

25.     In the course of the settlement discussions, Battley inquired as to whether Weimar had any surveys of the vessel.  Weimar responded that he hadn't had any surveys performed since a complete rebuild of the *Renewal* that he had done in 1997-98.

26.     Weimar, in fact, had two surveys done for the *Renewal*, one when he acquired the vessel in 1996, and the second after the complete rebuilding and rehabilitation of the

vessel in 1998.  The survey values were $395,000 and $800,000, respectively.  The $800,000 survey valued the *Renewal* immediately after the complete rebuild and noted: "There is nothing left that could have been improved that was not.  This vessel is as close to being new as possible without being new."  Four and one-half years elapsed between completion of the second survey and the time of the settlement negotiations.  The *Renewal* had depreciated substantially over that period of time.

27.     Weimar did not disclose the existence of either of the surveys during the course of the settlement negotiations.  The surveys contained material information which would have been helpful to Battley in assessing the value of the *Renewal*.

28.     In the course of settlement discussions, Weimar represented that the *Renewal* had been listed for sale for five months with no offers.  In fact, the vessel had been listed for at least one year with no offers.

29.     Sean Fenniman is a yacht broker with Allied Richard Bertram Marine ("Bertram").  Bertram has facilities throughout Florida, including Ft. Lauderdale and Stuart, Florida.  Fenniman has brokered the sale of 150 yachts with prices ranging from $100,000 to $2,400,000.  Bertram employs 65 brokers and its gross sales have averaged $400,000,000 a year.  Bertram sold 2,000 vessels in 2002 for prices ranging from $50,000 to $12,000,000.

30.     Fenniman is an expert in the valuation of yachts.  He knows the true market value of yachts similar to the *Renewal*.

31.     Fenniman originally listed the *Renewal* for $1.5 million in May of 2002 based upon his conversations with Weimar.  The boat was in Puerto Rico at the time Fenniman

6

acquired the listing, and he had not yet inspected it. The boat was moved to Ft. Lauderdale, Florida in September of 2002. Fenniman inspected the boat there. He called Weimar soon after the inspection. He told Weimar the boat was exorbitantly priced and could not sell for anywhere near the listed price. Compared to other boats on the market, the *Renewal* was old, slow, narrow and high maintenance. Additionally, the boat was not in the pristine or Bristol condition that Weimar had represented. Fenniman told Weimar the boat would never sell for a million dollars.

32.    Fenniman believed the *Renewal* could have been sold for $500,000 in 2002. He thought the vessel should have been listed for about $695,000. He informed Weimar of his opinions regarding the value of the vessel and the appropriate listing price. Weimar did not disclose Fenniman's opinions to Battley or the other parties during the settlement negotiations. Fenniman's opinions would have been material to the settlement process.

33.    On the day the hearing on approval of the settlement was held in the bankruptcy court, December 31, 2002, Weimar called Fenniman. Weimar instructed Fenniman that if Battley called, Battley was to be informed that the *Renewal* was worth $1 million but that it might bring more from the right buyer. Fenniman reiterated to Weimar that the vessel was not worth $1 million. Battley did not call Fenniman on December 31, 2002, and did not learn of Fenniman's conversations with Weimar until after the settlement had been approved, in mid-January, 2003. Weimar admitted in his deposition that it would have been wrong to instruct Fenniman to inform Battley that the vessel was worth $1 million.

34.    In the course of the settlement discussions, Weimar informed Battley that the

*Renewal* had originally been listed at $1.495 million, and had recently been reduced to $1.2 million. Battley reasonably believed the listing, as reduced, reflected a realistic asking price. Battley concluded he could expect to sell the vessel fairly promptly and net more than $600,000, and up to $1 million for the estate.

35.   In the course of the settlement discussions, Weimar represented that he had invested approximately $600,000 in the construction of a house in Montana. This sum included the land acquisition costs of $110,000. Weimar's representations were grossly understated. By December 31, 2002, Weimar had, in fact, invested $1,067,937.40 in the property.

36.   Battley filed a motion to approve the settlement with Weimar in the bankruptcy court on December 30, 2002. The motion included a statement that the *Renewal* was expected to "produce a substantial value somewhere in the range of $600,000 to $1 million." The low end of the range was based on Weimar's representation that he had paid $600,000 for the vessel. Based on this representation, Battley's counsel had concluded that, even under a worse case scenario, Battley should at a minimum recover the original purchase price because Weimar claimed to have invested an additional $1.2 million in the vessel after purchasing it.

37.   The parties ultimately reached a settlement which required Weimar to transfer the following assets to Battley:

a)      the *Renewal,*

8

      b)        $157,000 cash from funds being held in the Alaska Superior Court registry,

      c)        title to real property in Auburn, Washington,

      d)        a $650,000 put/call in favor of the trustee on a Delta Junction promissory note,

      e)        $350,000 cash to be paid by Weimer on the earlier of September 30, 2003, or the receipt of Weimar's tax refund, and

      f)        $300,000 cash to be paid by Weimar by May 30, 2004.

The transfer of the *Renewal* and certain of the other assets allowed Weimar to use substantial loss carry backs which otherwise would have expired on January 1, 2003.

38.     Under the settlement, Weimar also agreed to pay in full, or otherwise resolve, all claims asserted against the Allvest bankruptcy estate except the claims of Brown and the J.W. creditors.  These two remaining claims would be paid in the Allvest bankruptcy estate from the funds Battley received under the settlement.

39.     Under the settlement, Weimar was to retain certain assets, including the home he was building in Montana, a $210,000 promissory note, and real property located at Caswell Lake, Alaska and in Edmunds, Washington.  Weimar was also to receive the balance of the funds being held in the Alaska Superior Court registry, $330,000.

40.     The settlement was entered into on the express condition that Weimar had made a full and fair disclosure of all his assets.  Weimar was required to sign an affidavit attesting to the accuracy of his representations regarding his assets.  The trustee's motion to approve the settlement stated that "[t]he basic purpose of the affidavit is to make sure that

the settlement is made on an informed basis in which all of the cards are on the table." (Ex. 55, p. 6)  The affidavit was a critical and necessary requirement of the settlement.

41.     Battley's counsel insisted that Weimar put his representations under oath in a pleading before the bankruptcy court to ensure that the representations were accurate and impress upon Weimar the fact that there would be serious consequences if he made material misrepresentations.  Weimar was also informed during the settlement negotiations of the importance that his representations be complete and truthful.

42.     The Settlement Agreement was prepared on the stationery of Weimar's counsel.  Paragraph 12 of the agreement provides:  "As a condition to this settlement, Weimar will execute an affidavit which will contain a full and complete disclosure of: . . . b) a reasonable estimate of the current market value of the property disclosed in the affidavit." (Ex. 60, p. 7)

43.     A draft of Weimar's affidavit was circulated at the December 31, 2002, hearing before the bankruptcy court.  The purpose of the affidavit was described at the hearing as follows:

> Mr. Weimar will be signing an affidavit that the parties are relying on as a condition of the settlement  .  .  .  In the event – and they are relying on two things about those disclosures. They are relying on the disclosure of the asset itself, and they are relying on a reasonable estimate of the valuation of the asset, and we have a summary spreadsheet that has been prepared by Mr. Sneed's office that describes those disclosed assets.  (Ex. 63, p. 10)

44.     After a lengthy hearing, the bankruptcy court approved the settlement agreement on December 31, 2002.  It entered findings and conclusions on approval of the settlement agreement which found the settlement reasonable "[i]n light of, and in direct reliance upon, Weimar's representations in that affidavit."  (Ex. 56, p. 2)   The bankruptcy court further found that "[t]he total value of the assets being paid into the estate under the terms of the settlement agreement are adequate in light of the representations of value made in the Weimar affidavit."  (Id.)

45.     After the settlement was approved, Weimar did not provide his finalized affidavit until January 14, 2003.  Siemers refused to allow the release of funds that had been frozen by order of the state court to Weimar until the affidavit was signed.  Weimar retaliated by canceling the insurance on the *Renewal* and other assets, contrary to his earlier promises. Once Weimar signed the affidavit, Siemers immediately stipulated to release of the funds.

46.     Weimar claimed to have done "due diligence" to refine the valuation information previously set forth in the spread sheets (Exs. 43, 53) before confirming those numbers in his finalized affidavit.  Revisions to the affidavit were made before it was finalized and signed by Weimar on January 14, 2003.  (Ex. 67) The finalized affidavit states:

> This affidavit is given for the purpose of making full and complete disclosure of:  a) all assets Weimar now owns directly or indirectly through any person, including entities ("Person"); b) a reasonable estimate of the current market value of those assets;

and that

> Attached as Exhibit A is a full and complete disclosure of:  a) all assets I now own, directly or indirectly through any Person; b) a reasonable estimate of the current market value of those assets.

(Ex. 67, ¶¶ 1-2).

47.     The disclosures in the final affidavit varied from those made on the Summary Assets prepared at the first settlement meeting in the following respects:

a)     the "Net Value" of real property in Edmonds, Washington, which Weimar retained under the Settlement Agreement increased by $100,000,

b)     the "Net Value" of real property in Crystal Lake, Alaska, which Weimar retained under the Settlement Agreement, increased by $25,000,

c)     the amounts invested in Weimar's home in Montana were increased from $600,000 to $750,000 as of December 31, 2002,

d)     the figure for "Debts & Costs" for the *Renewal* was adjusted from $0 to $100,000 to reflect commonly assumed closing costs, thereby decreasing the "Net Value" by $100,000; and

e)      a previously undisclosed $50,000 promissory note that Weimar was retaining was added to the summary.

48.     Weimar contends the numbers for the *Renewal* under the "Value" column of the December 20 and 30 asset summaries produced during settlement negotiations (Exs. 43, 53) and on his finalized affidavit (Ex. 67) were not a representation of his estimate of the vessel's fair market value, but simply a statement of the listing price. This contention is not credible. An express condition of the settlement was that Weimar provide a reasonable estimate of the current market value of his property. This condition was emphasized in the settlement documents, at the hearing on the settlement, and in the Weimar affidavit itself. Weimar's contention flies in the face of this express condition, which was reiterated numerous times, and also contradicts contemporaneous documents prepared by Weimar's accountant (Ex. 53) and Weimar himself.

49.     Battley first met Fenniman, the boat broker for the *Renewal*, in mid- to late January, 2003. Battley learned that Weimar had removed personal property and fixtures from the *Renewal*, which reduced its marketability. Fenniman informed Battley the *Renewal* was substantially overpriced. Battley reduced the listing price from $1.2 million to $795,000, and instructed Fenniman to convey all offers. Fenniman thought the asking price was still too high.

50.     The *Renewal* remained at the Bertram facility in Fort Lauderdale from the time Weimar had it delivered there in September, 2002, until September, 2003. The vessel was under cover and protected from the sun the entire time. Weimar suggests the *Renewal* did

13

not sell because the finish on its teak deteriorated due to exposure to the sunlight and weather. The evidence establishes teak does weather and needs to be periodically revarnished to look its best, but no evidence was submitted which established that the *Renewal* suffered this kind of weathering while it was in the covered facility in Fort Lauderdale, protected from the elements. Weimar never sent any money to have the teak refinished while he had the vessel listed in Fort Lauderdale. There was evidence that the teak weathered after the *Renewal* was moved to Bertram's uncovered facility in Stuart, Florida in September of 2003. However, there is no evidence that teak refinishing is anything other than normal maintenance, or that the failure to refinish the teak prevented the vessel from selling.

51.     When it became apparent that the *Renewal* was overpriced and would not sell at anything approaching the value represented by Weimar, Battley made several attempts to sell the vessel back to Weimar. Weimar refused to even discuss the proposition.

52.     The *Renewal* did not generate any offers while it was listed by Battley. By August of 2004, the *Renewal* had been listed for two years and nine months (December, 2001, through August, 2004) without receiving a single offer.

53.     The *Renewal* was substantially damaged by a hurricane in August of 2004. Bertram/Fenniman had taken reasonable steps to protect the *Renewal* from the hurricane. However, a large metal vessel broke loose from another facility, and collided with the *Renewal* as well as other vessels.

54.     The estimated cost to repair the hurricane damage to the *Renewal* was $200,000. (Ex. 111)  The highest and best offer Battley ever received from the insurance company, representing the *Renewal's* "actual cash value" prior to the hurricane, was $375,000. (Ex. 110).  The *Renewal* ultimately generated an offer from a buyer through an Internet auction, on an "as is" basis, for $161,000.  (Ex 121)  The bankruptcy court has approved the sale of the *Renewal* at this price.   The proceeds Battley expects to receive from the insurance recovery and sale, without deduction for holding costs, will be approximately $308,000.  This sum consists of the $161,000 gross sales price for the *Renewal*, less an 11% broker's commission and costs of sale in the amount of $17,710, plus $165,000 from insurance (representing the $200,000 insurance repair estimate, less a $35,000 deductible). The sales price plus the insurance repair estimate supports a value in the range of $375,000 as determined by the insurance company.

55.     Battley filed an adversary complaint against Weimar in the bankruptcy court on December 22, 2004.  He filed an amended complaint on April 20, 2005, which alleged two claims for relief – breach of contract and misrepresentation – and prayed for damages in excess of $100,000 as proven at trial, plus costs and attorney's fees.  Trial of this matter was held before the bankruptcy court on December 12th through the 15th, 2005.

56.     At trial, Battley, testifying as owner of the *Renewal*, stated that the boat was worth approximately $350,000 to $400,000 in January, 2003.  His testimony was supported by the following:  1) the actual marketing experience of the *Renewal* from December, 2001, through December, 2005, when no offers were made until the Internet auction in December,

15

2005;  2) the insurance estimates ($375,000 – Ex. 110);  the cost of repair plus the salvage auction price ($361,000 – Exs. 111, 121); and 4) Mr. Fenniman's March, 2004, estimate which places a value of between $395,000 and $450,000 on the *Renewal*.

57.     Mr. Elliott, who had performed services on the *Renewal* when it was docked in Puerto Rico, also provided an estimate of its value.  He claimed he expected the *Renewal* would readily sell for $1.1 to $1.2 million in Fort Lauderdale.  Mr. Elliott was not provided the information regarding the actual marketing history of the vessel, including the fact that it was marketed in a covered facility in Fort Lauderdale for approximately fifteen months, mostly at a reduced price, without a single offer.  Moreover, Mr. Elliott lacked the experience and qualifications necessary to render a value opinion on a motor yacht like the *Renewal*.

58.     Six months would have been more than enough time, under normal conditions, in which to sell the *Renewal* if it had been listed at a realistic price.  If listed at a realistic price, the vessel should have sold no later than June of 2003.

59.     The *Renewal* was worth less than one half of Weimar's $1.2 million represented value.  Weimar knew this, as evidenced by his December 31, 2002, call to Fenniman, his misrepresentations regarding the original price he paid for the vessel, the length of time the *Renewal* had been listed, and his misrepresentation regarding the non-existence of the surveys.

60.     In his initial asset summary, Weimar listed his Montana land and improvements as having a cost and value of $600,000.  In his final affidavit, Weimar stated his investment in the Montana house was $750,000 as of December 31, 2002.  The representations as to

16

value were to be based on Weimar's investment in the realty. Weimar's actual investment in the home was $1,069,937 as of December 31, 2002.

61. Weimar's explanation for the termination of his attorney-client relationship with his former counsel, Cabot Christianson, was not credible. Weimar stated that he terminated Christianson because he had difficulty contacting him. Christianson testified that he withdrew from representing Weimar because Weimar continued to violate the state court injunction which froze his assets by pouring cash into the construction of his home in Montana. Christianson was a credible witness; Weimar was not.

II.    Conclusions of Law

1.    This is a non-core, related proceeding under 28 U.S.C. § 157(c)(1).  *In re Valdez Fisheries Dev. Ass'n*, 7 A.B.R. 222 (Bankr. D. Alaska 2002), *aff'd*, 7 A.B.R. 486 (D. Alaska 2004).

2.    The bankruptcy court has limited jurisdiction pursuant to 28 U.S.C. § 1334(b) and the district court's order of reference.  Here, the reference is solely for preparation of proposed findings of fact and conclusions of law.

3.    The district court has jurisdiction to enter a final order and judgment pursuant to 28 U.S.C. § 1334(b).

4.    This court declines to apply the holding of *Mann v. Alexander Dawson, Inc. (In re Mann)*, 907 F.2d 923, 926 (9th Cir. 1990) to the case at bar.  Review of the bankruptcy court's findings and conclusions will be de novo, in accordance with 28 U.S.C. § 157(c)(1).

5.    The trustee has asserted claims for breach of contract and misrepresentation.  Alaska's substantive law controls the trustee's claims.  *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000).

6.    The trustee is not limited to recision of the settlement agreement as a remedy.  He has the option of affirming the contract and seeking damages resulting from a fraudulent misrepresentation. *Thompson v. Wheeler Constr. Co., Inc.*, 385 P.2d 111, 113 (Alaska 1963).

7.    The trustee has the burden of proving his fraudulent misrepresentation claim by a preponderance of the evidence.  *Dairy Queen of Fairbanks v. Travelers Indem. Co. of*

18

*America*, 748 P.2d 1169 (Alaska 1988); *Gabaig v. Gabaig*, 717 P.2d 835, 838 (Alaska 1986);

*Saxon v. Harris*, 395 P.2d 71, 72 (Alaska 1964).

8.     The elements of a claim for knowing misrepresentation include: "a false

representation of fact, scienter, intention to induce reliance, justifiable reliance, and

damages." *Barber v. Nat'l Bank of Alaska*, 815 P.2d 857, 862 (Alaska 1991).

9.     Fraud also includes instances where a defendant's statements are half truths,

or true remarks which omit material information. *Carter v. Hoblit*, 755 P.2d 1084, 1086

(Alaska 1988).

> The Restatement (Second) of Torts § 529 (1977) provides that
> a literally true statement may be fraudulent if it omits additional
> qualifying information likely to affect the listener's conduct. "A
> representation stating the truth so far as it goes but which the
> maker knows or believes to be materially misleading because of
> his failure to state additional or qualifying matter is a fraudulent
> representation." *Id.; see also Prosser on Torts* § 106, at 738
> ("[I]f the defendant does speak, he must disclose enough to
> prevent his words from being misleading . . . ")

*Id.* at 1086-87.

10.     Alaska also recognizes the tort of negligent misrepresentation. *Barber v. Nat'l*

*Bank of Alaska*, 815 P.2d at 862.

> [U]nder delineated circumstances, "a duty to provide accurate
> information" [exists] once one undertakes to speak. *Bevins v.*
> *Ballard*, 655 P.2d 757 (Alaska 1982); *see also Transamerica*
> *Title Insurance Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973). In
> determining whether a duty to "speak carefully" exists, the
> *Bevins* decision lays out the following test:

> (a)      whether the defendant had knowledge, or its equivalent, that the information was desired for a serious purpose and that the plaintiff intended to rely upon it;
>
> (b)      the foreseeability of harm;
>
> (c)      the degree of certainty that plaintiff would suffer harm;
>
> (d)      the directness of causation; and
>
> (e)      the policy of preventing future harm.

*Barber,* 815 P.2d at 862.

11.      The tort of negligent misrepresentation contains four elements:  1) the party accused of making the misrepresentation must have made the statement in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest;  2) the representation must supply false information;  3) there must be justifiable reliance on the false information; and  4) the party making the misrepresentation must have failed to exercise reasonable care or competence in obtaining or communicating the information.  *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 671(Alaska 2002), *citing Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 380 (Alaska 1984).

12.      Weimar's "Summary Assets" (Exhibit 43) listed an "Interest in Boat" with the figure $1,200,000 placed under the column entitled "value."  Under the column entitled "net," Weimar put "$1,200,000 current listing; no offers in 5 months; $1.6 million invested." Weimar knew the value placed on the boat was highly inflated.  He also knew that boat broker Fenniman of Allied Bertram Marine had repeatedly advised him that the boat was grossly overpriced.  Fenniman explicitly reiterated his view prior to the December 31, 2002, hearing on approval of the settlement agreement.  While the statement of having a $1.2

20

million listing was literally true, it failed to properly disclose the listing broker's opinion that the listing was exorbitant and grossly in excess of the true market value of the boat. Additionally, the boat had been previously listed with another broker for seven months. The total time for both listings was 12 months. Weimar's statement that no offers were received in five months, while literally true, left a false and misleading impression. In fact, the boat had been listed for twelve months with no offers.

13.    Weimar's statements regarding the non-existence of prior surveys were fraudulent misrepresentations of fact.

14.    Weimar's representations as to the price he paid for the *Renewal* were fraudulent misrepresentations of fact.

15.    Justifiable reliance, rather than reasonable reliance, is required to establish fraud. Justifiable reliance is a less rigorous standard than reasonable reliance. As noted by the Supreme Court in *Field v. Mans*, 516 U.S. 59, 70-71 (1995):

> Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the [Bankruptcy] Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. *Id.*, § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.,* § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied

21

> mortgage. *Id.*, § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.*, § 545A, Comment *b*.

The trustee justifiably relied upon Weimar's representations.

16.     Weimar's overt misrepresentations as well as his half truths and omissions were made with the intent to deceive the trustee as to the value of the *Renewal*. They were material to the transaction. Battley justifiably relied on the representations, half truths and material omissions of Weimar.

17.     Weimar argues his misrepresentations were "mistakes" that resulted from the time pressures of the settlement process. This argument is not credible. These misrepresentations were deliberate falsehoods, not "mistakes." Moreover, while the trustee and the professionals were under great time pressures to complete various tasks, Weimar was not. He started considering transferring the *Renewal* as part of a settlement no later than November, 2002. His task list in connection with the closing was short in comparison to the professionals' lists. He was not drafting the settlement documents; the lawyers were. More importantly, Weimar had a two week interval between the date of the settlement hearing and the date he provided his finalized affidavit. He claimed to have done due diligence over

22

those two weeks to insure the accuracy of the representations in the affidavit. He revised several of his representations based on his due diligence.  He had sufficient time to investigate the assets involved in the settlement to ensure that his affidavit contained accurate statements.  His deliberate misrepresentations, made after time for reflection, cannot fairly be compared with inadvertent mistakes of counsel in drafting multiple documents over the course of less than 24 hours.  Moreover, Weimar was specifically instructed by his attorney of the need for full and honest disclosure.

18.     The trustee is entitled to damages based on the difference between the *Renewal's* actual value and its represented value. *Turnbull v. LaRose*, 702 P.2d 1331, 1336 (Alaska 1985).  Weimar represented to Battley that the *Renewal* had a value of at least $800,000 as of December 31, 2002.  Its actual value on that date was, at most, $500,000. Weimar owes the trustee $300,000 for his fraud.

19.     Weimar argues that Battley has suffered no damages as a result of his fraud because Battley signed a tax return prepared by Allvest's accountants indicating that the *Renewal* had a market value of $800,000.  Weimar conveniently ignores the fact that he initially sought to use a $1.2 million value for the *Renewal* for tax purposes.  Battley refused to sign the return with such a value.  The $800,000 number was a compromise number and not a reflection of true market value for the yacht.  The return was signed April 10, 2003. Battley had only been marketing the yacht for about three months at that time.  Battley's testimony at trial, with the benefit of years of actual market experience for the *Renewal*, indicates the boat was actually worth only $350,000 to $400,000 at the time of the settlement.

20.    Weimar maintains that Battley suffered no damages because Weimar had refused an $850,000 offer on the *Renewal* prior to the time of the settlement. There was no formal written offer, however, simply an oral inquiry as to whether Weimar would consider an offer in the $850,000 range. Weimar refused to consider this inquiry. No written offer was ever received. The prospective buyer was simply "tire kicking." Fenniman received other inquiries on the boat, but they were in the $500,000 range and much more representative of its value.

21.    Battley also seeks consequential damages consisting of holding costs he incurred for the *Renewal* until it was sold. However, the trustee failed to provide Weimar's counsel with documentation supporting the holding costs until just before trial. Additionally, Battley failed to update his pretrial disclosures to include any alternative damage theories, such as holding costs. Because of the lack of pre-trial disclosure, no holding costs will be awarded as damages. Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers' Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001).

22.    The trustee is entitled to pre-judgment interest from the date of service of process on Weimar, January 13, 2005, until entry of judgment. A.S. 09.30.070(b).

23.    As an alternative basis for relief, the court finds Weimar liable for the tort of negligent misrepresentation. He had a duty to speak carefully because he had knowledge that the information regarding the boat was desired for a serious purpose and that the plaintiff intended to rely on it. Harm to the plaintiff was reasonably foreseeable and certain to occur.

24

There was a direct cause and effect between the misrepresentations, half-truths and omissions and damages sustained by the plaintiff.

24.     Weimar's negligent misrepresentations were made in the course of a transaction in which he had a pecuniary interest.  The representations supplied false and misleading information and Weimar failed to exercise reasonable care in communicating the information.  The plaintiff justifiably relied on the negligent misrepresentations.  He has suffered damages in the sum of $300,000, constituting the difference between the *Renewal's* actual value and its represented value.

25.     Weimar also lied to the trustee about the amounts he had invested in a home in Montana.  He understated the amounts of money he had poured into the home in order to cover up the fact that he had violated a state court injunction.  He knew the trustee would rely on his representations.  The trustee justifiably relied on Weimar's misleading statements regarding the value of the Montana property.  Weimar's statements regarding the value of the Montana property were fraudulent and/or negligent misrepresentations.

26.     In Alaska, damages based on misrepresentation must be established with reasonable certainty and cannot be speculative or contingent.  *Alaska Ins. Co. v. Movin' On Constr., Inc.*, 718 P.2d 472, 474 (Alaska 1986); *Transamerica Title Insur. Co. v. Ramsey*, 507 P.2d 492, 497 (Alaska 1973).  Damages for what the parties might have agreed to in the absence of Weimar's misrepresentations regarding the value of the Montana home are too speculative to permit recovery.

27.     The plaintiff seeks an award of punitive damages against Weimar.  To receive such an award, the plaintiff must establish, by clear and convincing evidence, that Weimar's conduct was "outrageous, including acts done with malice or bad motives," or reflected a "reckless indifference to the interest of another person."  A.S. 09.17.020(b).  Punitive damages can be awarded in breach of contract and misrepresentation cases. *Casciola v. F.S. Air Service, Inc.*, 120 P.3d 1059 (Alaska 2005).

28.     In evaluating the reprehensibility of a defendant's tortious conduct for the purpose of awarding punitive damages, courts should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Casciola*, 120 P.3d at 1067, *citing State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 419 (2003).

29.     Although Weimar has engaged in substantial misconduct, I do not think an award of punitive damages is warranted.  Weimar has not caused physical injury or acted with disregard to the health or safety of others.  Moreover, Weimer is already paying a huge portion of the $3 million in punitive damages which were awarded to the J.W. creditors and Brown, prepetition, through his payments to the plaintiff under the settlement agreement. No purpose will be served by awarding additional punitive damages here.

30.     When state law and not federal bankruptcy law governs the rule of decision in a contested matter, a prevailing party may recover attorney's fees in accordance with applicable state law.  *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441-42 (9th Cir. 1997). The plaintiff is entitled to attorney's fees under Rule 82, of the Alaska Rules of Civil Procedure.  The plaintiff shall recover attorney's fees in the amount of $_____ from the defendant.

DATED:      February 2, 2006.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:      Patrick Gilmore, Esq.
Spencer Sneed, Esq.
P. Gingras, Adv. Case Mgr. - served 2/2/06 – pg.

02/02/06

27